# Richmond

## P. Robin v. Sydeman Brothers, Incorporated.

March 24, 1932.

Present, Campbell, C. J., and Holt, Epes, Hudgins and Gregory, JJ.

The opinion states the case.

*B. A. Banks* and *Kelsey & Jett*, for the plaintiff in error.

*Nathaniel T. Green* and *W. M. Grant*, for the defendant in error.

GREGORY, J., delivered the opinion of the court.

The plaintiff in error instituted this action to recover damages from the defendant in error, claiming that he had been wrongfully discharged from the employment of the defendant in error. The case was tried by a jury and the plaintiff in error was awarded damages for $1,500.00. The verdict was set aside by the court and final judgment entered for the defendant in error, the court being of the opinion that no damages had been proven. The plaintiff in error is now complaining of the action of the court in setting aside the verdict of the jury and in entering judgment for the defendant in error.

Robin will be referred to as the plaintiff and Sydeman Brothers, Incorporated, as the defendant, the respective positions occupied by them in the trial court.

The plaintiff was employed by the defendant as manager of its chain store in Norfolk under the following written contract:

"This agreement made this 11th day of October, 1929, between Sydeman Brothers, Incorporated, a corporation duly organized and existing under and by virtue of the laws of the State of New York, hereinafter called the employer, and Mr. Phil Robin, hereinafter called the 'employee'.

"Witnesseth:

"1. The employer hereby hires and employs the employee as manager of its store and business in the city of Norfolk, State of Virginia, conducted under the name of Federal

Clothing Stores and the employer agrees to pay employee for his services a sum equivalent to five per cent of all monies deposited in the bank designated by the employer received from sales and collections of said store while employee is in its employ and computed yearly after deducting the total amount of weekly remittances sent employee from headquarters during the current year as employee's weekly drawings. This drawing account is to be for the amount of $100.00 per week and shall be charged against and deducted from employee's compensation. If employee is not in the employ of the employer for at least six months employee's salary shall not exceed his drawing account.

"2.   The term of this agreement and of the employment is from week to week, and not otherwise."

The contract contained many other provisions but they are not material in the consideration of the case.

On October 17, 1929, the written contract above set out was changed and modified in relation to the compensation of the plaintiff by this letter written by the defendant's president:

"October 17, 1929.

"DEAR MR. ROBIN:

"This is to confirm arrangements made with you.

"You are to receive a drawing of $100.00 per week which is figured on the basis of $100,000.00 annual business for your store, with the definite understanding that your collections and your delinquent losses are to be at least as good as the average of the entire chain.

"If you do a business greater than $100,000.00 with the definite proviso that your collections and delinquents shall be no poorer than the rest of the chain, you are to receive as further compensation a bonus payable semi-annually on exactly the same proportion as your drawing mentioned above bears to the annual sales volume of $100,000.00.

"On the above basis it is understood between us that this arrangement is not to terminate before September 1, 1930.

"Needless to say, this matter is entirely confidential and I should like a definite acknowledgment by you, citing the various details accordingly.

"I wish you every success which I have every confidence in your producing accordingly.

"Very truly yours,
"W. H. SYDEMAN,
"President."

The plaintiff conducted the Norfolk store, under the contract as modified by the letter of October 17, 1929, from October 11, 1929, to March 6, 1930, on which latter date he received this letter from the defendant:

"March 6, 1930.

"DEAR MR. ROBIN:

"I am handing you herewith your drawing check for the amount of $75.00 which is the drawing I propose to pay you until your results warrant returning to your former drawing.

"I feel confident that you must realize that this drawing is a very liberal one in view of present results and that the former figure is absolutely impossible at the present time.

"Of course, since your drawing is based on a sales volume of $100,000.00, I hope and expect that when business does pick up, you will more than make up what you have lost to date so that I will be able to reimburse you for this deduction, but at the present time this represents absolutely the very best we can possibly do and knowing you to be a fair-minded man, I feel confident you will accept same on that basis accordingly.

"Very truly yours,
"W. H. SYDEMAN.
"President."

To which he replied as follows:

"March 8, 1930.

"DEAR MR. SYDEMAN,

"I am herewith returning your check number 12338. My contract arrangements with you call for a weekly drawing of one hundred dollars ($100.00) and I cannot accept anything less.

"Respectfully yours"

The defendant then sent the plaintiff a check for $100.00 and wrote him as follows:

"March 11, 1930.

"DEAR MR. ROBIN:

"I have yours of the 6th returning reduced drawing check.

"After giving the matter careful consideration and reviewing your latest figures I have decided to return you to your former drawing as per enclosed.

"I need hardly tell you that the salary we are paying is very substantial indeed and we naturally expect that results from your store are going to justify same, which of course was our idea as well as yours when we first entered into our agreement.

"Therefore, I hope and expect that these terribly inadequate and insufficient results will mighty soon be the thing of the past and that from now on you are going to turn in the kind of results we always have received from you in the past and which we need more than ever now.

"I have every confidence that you are giving Federal Norfolk and Sydeman Brothers the very best in every direction and know that you will continue to do so accordingly."

The weekly payments of $100.00 were paid the plaintiff until May 17, 1930, on which day the defendant discharged him without notice. The plaintiff then instituted this action to recover compensation for the remainder of the term which was fifteen weeks; that is from May 17th to September 1,

1930, the latter date being the time stipulated for the termination of his employment in the letter of October 17, 1929.

The jury found for the plaintiff and by the verdict has established the fact that the plaintiff was wrongfully discharged by the defendant. The only question which we are called upon to decide is whether the plaintiff has proven that he suffered any damage by reason of his discharge. The determination of this question involves the correct construction of the contract as modified by the letters of the parties. It is necessary to keep in mind the original contract, the letter of October 17th, and the letter of March 8th, and the conduct of the parties up to the 17th of May, the time the plaintiff was, according to the verdict of the jury, wrongfully discharged without notice.

It will be recalled that in the original contract of October 11th, the compensation of the plaintiff was fixed at a commission of five per cent on all monies deposited in bank received from sales and collections, which was to be computed annually. He was allowed a drawing account of $100.00 per week which was to be charged against his commissions. The term of the employment was "from week to week and not otherwise."

On October 17th, just six days after the original contract had been entered into by the parties, it was materially changed and modified by Sydeman's letter of that date. Under this letter the drawing of $100.00 per week was continued but it was to be computed on the basis of a volume of business of $100,000.00 a year and also with the "definite understanding" that the collections and delinquent losses "are to be at least as good as the average of the entire chain." Provision was made for a bonus if the business exceeded $100,000.00 a year which was to be paid semi-annually on "exactly the same proportion as your drawing mentioned above bears to the annual sales value of

$100,000.00" but with the "definite proviso that the collections and delinquents shall be no poorer than the rest of the chain."

Provision was made that the contract "is not to terminate before September 1, 1930."

The terms set forth in the letter were agreed to by the plaintiff and he continued to be the manager of the store. Each day he sent a duplicate deposit slip to the defendant which showed the exact amount of money deposited in the bank each day. A complete record of each day's business was also sent the defendant each day. The defendant, therefore, could have ascertained the condition of the business at the end of any day. The volume of business done, the amount of money collected and the losses were shown in these records which were in its possession. From the very beginning it clearly appeared from the records that the volume would not reach $100,000.00 and it also appeared that the collections and delinquent losses were not as good as the average of the entire chain. Finally it became so manifest that the plaintiff could not reach the goal required by the contract that Sydeman wrote him on March 6th, that the drawing would be reduced to $75.00 per week and enclosed a check for that amount to the plaintiff. The plaintiff, by letter of March 8th, refused to accept any reduction in his weekly drawing and returning the $75.00 check. He called attention to the former arrangement whereby he was entitled to $100.00 per week. Acceding to the claim of the plaintiff, the defendant, on March 11th, sent the usual check for $100.00 along with the letter of that date. In the letter it was agreed to restore the plaintiff to his former drawing of $100.00 per week. He was reminded that the "salary" was very substantial and the hope was expressed that the results would justify it; that the "terribly inadequate and insufficient results" would soon be a thing of the past and that "you are going to turn in the kind of

results we always have received from you * * *." Nothing whatever was mentioned in this letter about the volume of business to be produced by the plaintiff and nothing was said about the collections and losses. The weekly payments, however, were referred to as "salary." The defendant then continued to send the plaintiff $100.00 each week, for some ten or eleven weeks, until May 17th, the date of his dismissal. Almost from the beginning of the employment, it was perfectly clear to the defendant that the plaintiff was not producing a $100,000.00 volume of business and his collections and losses were not as good as the average of the chain.

When the defendant obtained knowledge of the fact that the plaintiff was not meeting the requirements of the contract it had the right to elect (1) to stand upon the strict terms of the contract and insist that the plaintiff produce a volume of business that would in a year amount to $100,000.00 and to insist that the collections and losses would be as good as the average of the chain, and if the plaintiff could not meet these requirements (and the evidence conclusively shows that he could not) the defendant had the right to treat such failure as a breach, or (2) the defendant had the right to elect to retain the plaintiff as its manager, continue the $100.00 weekly payments and condone the breach. It elected to do the latter. It retained the plaintiff notwithstanding his failure to comply with the terms of the contract, continued to pay him $100.00 per week for some ten or eleven weeks after the president of the defendant had unsuccessfully attempted to reduce the payments to $75.00, and when it suited its convenience it discharged the plaintiff and is now claiming that the discharge was justified because the plaintiff failed to comply with the terms of the contract.

Williston on Contracts, volume 2, section 725, has this to say:

"In the law of master and servant, if the master has cause justifying the discharge of the servant, and nevertheless continues, with knowledge of the facts, to receive the benefit of the servant's services, he cannot afterwards make the breach ground for discharge. It is true that a number of authorities lay down the rule that the question whether the servant's breach of duty is excused as a ground for dismissal by retaining him in his employment is a question of fact for the jury. These authorities are based to some extent on the theory that waiver must be intentional, and fail to observe that the question here presented is one of election and not of a form of waiver where even apparent intention is important. The employer has no right, whether he desires it or not, and whatever intention he manifests, to continue the employment and yet retain the right to assert a breach of condition. It is true that an employee may consent to be retained on such terms, but his clearly expressed assent is necessary, for it cannot be presumed. What amounts to a continuance of services may involve a more troublesome question than what amounts to receipt of rent or the doing of any other single act. Employment is a continuing matter and to say that if the employer knowingly lets the employee continue to work a minute, an hour or perhaps a day after he discovers the breach he has lost the right of discharge, is going too far. But prompt action should be required so that the master does not put himself in the inconsistent position of receiving benefit from the continuance of the contract while it suits his convenience so to do and at the same time reserving the right of ending it when that suits his convenience. Condonation of one breach of contract which would afford ground for the employee's discharge does not prevent the employer from considering the whole record of the employee when a further breach has been committed."

The terms of the contract requiring the $100,000.00

volume of business to be done and that the collections and losses should be as good as the average of the chain, were terms for the benefit of the defendant and under the law it could have insisted that they be complied with, or it could waive them if it desired so to do, and the latter is what it did by its conduct in continuing the payments in accordance with the plaintiff's construction of the contract, after it had full knowledge of the plaintiff's failure to comply with those terms.

In *Standard Ice Co.* v. *Lynchburg Diamond Ice Factory,* 129 Va. 521, 106 S. E. 390, 393, this is said:

"The dealings of the parties to a contract in relation to its terms are often conclusive upon questions arising as to its effect or meaning. This may be because the parties have deliberately and mutually disregarded its plain terms, or it may be because they have so dealt with each other as to definitely fix the meaning of the terms which would otherwise be of doubtful import. In the former case their plain rights have been waived, and this may apply to either a part or the whole of the period covered by the contract, depending, of course, upon the length of time during which the waiver has been in operation. In the latter case the doubtful rights of the parties have been fixed by their practical dealings with each other. In either case however, if their course of dealing has been of doubtful purpose and import respecting the meaning of the contract, such dealings are themselves open to explanation and interpretation."

In any event, whatever doubt there may have been in the meaning of the terms of the contract regarding the plaintiff's compensation, it was removed by the dealings of the parties and the construction they placed upon those terms. When the plaintiff demanded the weekly payment of $100.00 in his letter of March 8th, claiming that he was entitled to it under the contract as construed by him and

the defendant paid that amount to him and continued so to do for ten or eleven weeks, it certainly acquiesced in the plaintiff's construction, that he was entitled to be paid $100.00 per week. If a written contract is capable of more than one construction, then the courts will give to it that construction which the parties have placed upon it. *Holland* v. *Vaughan,* 120 Va. 328, 91 S. E. 122; *Chick* v. *MacBain,* 157, Va. 60, 160 S. E. 214.

The plaintiff having been wrongfully discharged by the defendant on May 17, 1930, and under the contract being entitled to his employment until September 1, 1930, a period of fifteen weeks, the measure of his recovery is the total amount of wages for the unexpired term, which in this case has already been correctly assessed and fixed by the jury at $1,500.00.

We are of opinion that the judgment of the lower court be .set aside, the verdict reinstated, and we now enter judgment thereon for the plaintiff.

*Reversed.*

EPES, J., dissenting.

The court. in its opinion says: "When the defendant obtained knowledge of the fact that the plaintiff was not meeting the requirements of the contract it had the right to. elect (1) to stand upon the strict terms of the contract and insist that the. plaintiff produce a volume of business that would in a year amount to $100,000.00 and to insist that the collections and losses would be as good as the average of the chain, and if the plaintiff could not meet these requirements (and the evidence conclusively shows that he could not), the defendant had the right to treat such failure as a breach, or (2) the defendant had the right to elect to retain the plaintiff as its manager, continue the weekly payments and condone the breach."

But the court then holds that the fact that Sydeman

Brothers, Incorporated, continued to pay Robin $100.00 per week for some ten or eleven weeks after the president of the company had tried to reduce his drawing account to $75.00, because of Robin's failure to meet the requirements of the contract as to volume of sales, collections and losses, operated as a complete and final waiver for all time of the provisions of the contract relating to volume of sales, collections and losses. With this conclusion I do not agree.

The fact that Sydeman Brothers, Incorporated, did not, when Robin refused to accept $75.00 per week, dismiss him because of his failure to meet the requirements of the contract as to volume of sales, collections and losses, I think, was not a complete and final waiver of these terms of the contract. It was only a condonation subject to the implied condition that the deficiencies as to volume of sales, collections and losses would be corrected in the future, at least, to the extent of bringing his record for the future up to the average standard fixed by the contract.

The evidence conclusively shows that after the acts which the court in its opinion holds to have been a waiver, Robin still continued to fail to bring the volume of the sales and collections up to the contract standard, and to keep his losses down to the contract standard. I think that when, after a reasonable time, it was apparent that he could or would not do so, the conditional condonation ceased to be operative, and Sydeman Brothers, Incorporated, had the same right to assert a breach of the contract as if it had not at any time condoned the default on his part. The quotation in the opinion of the court from 2 Williston on Contracts, section 725, seems to me to be, for the most part, inapt. The case, I think, should be controlled by the principle of conditional condonation applicable to that class of cases of which the below are examples: *Spotswood Arms Corp.* v. *Este,* 147 Va. 1047, 1064, 133 S. E. 570; *Gerber* v. *Kalmar, Puck & Abrahams Consolidated,* 104 Misc. Rep. 85, 171

N. Y. S. 92; *Gordon* v. *Dickinson,* 100 W. Va. 490, 130 S. E. 650, 44 A. L. R. 526; *Hill Cattle Corp.* v. *Killborn,* 79 Mont. 327, 256 Pac. 497; *Ginsberg* v. *Friedman,* 146 App. Div. 779, 131 N. Y. S. 517; *United Oil, etc., Co.* v. *Grey,* 47 Tex. Civ. App. 10, 102 S. W. 934; *Johnson* v. *E. Van Winkle, etc., Works,* 130 N. C. 441, 41 S. E. 882; *Glasgow* v. *Hood* (Tenn.), 57 S. E. 162; *Gray* v. *Shepard,* 147 N. Y. 177, 41 N. E. 500; *Siselman* v. *Cohen,* 25 Misc. Rep. 529, 54 N. Y. S. 991; *Yokel* v. *New York Tribune Corp.* (City Ct. N. Y.) 184 N. Y. S. 822; *Rubin* v. *Int. Film Co.,* 122 Misc. Rep. 413, 204 N. Y. S. 81; *Durr* v. *Clear Lake Park Co.,* 205 Iowa 279, 218 N. W. 54; *Macauley* v. *Press Pub. Co.,* 170 App. Div. 640, 155 N. Y. S. 1044, affirmed 222 N. Y. 696, 119 N. E. 1055; *Hauerback* v. *Calder,* 15 Utah 371, 49 Pac. 649; *Jerome* v. *Queen City Cycle Co.,* 163 N. Y. 351, 57 N. E. 485; *G. A. Kelly Plow Co.* v. *London,* 59 Tex. Civ. App. 208, 125 S. W. 974.

If the law of waiver or condonation be as stated by Justice Gregory in his opinion, it would of necessity operate to force an employer to discharge an employee practically as soon as a breach of contract of employment is discovered, instead of pursuing the more liberal course of giving the employee further time in which to correct his defaults and make good.

I see nothing in the conduct of the parties which warrants the conclusion that the parties understood that all provisions of the contract with reference to volume of business and standard of collections and losses had been finally and completely abrogated; or that what had been done or said was more than a conditional condonation of the failure of Robin to produce the results which he contracted to produce as the basis for determining his remuneration.