COURT OF APPEALS OF VIRGINIA


Present:   Judges Humphreys, Felton and McClanahan
Argued at Salem, Virginia


JULIE K. OVERCASH

                                                    MEMORANDUM OPINION* BY
v.        Record No. 0621-05-3         JUDGE ROBERT J. HUMPHREYS
                                                         JANUARY 24, 2006
JESSE L. OVERCASH


FROM THE CIRCUIT COURT OF MONTGOMERY COUNTY
Ray W. Grubbs, Judge

H. Gregory Campbell, Jr. (H. Gregory Campbell, Jr., P.C., on briefs),
for appellant.

John S. Huntington for appellee.


Appellant Julie K. Overcash ("wife") appeals from a decree ordering her to reimburse

appellee Jesse L. Overcash ("husband") for an alleged overpayment from husband's federal thrift

savings plan.  Wife argues that the trial court lacked the authority to alter the distribution of

funds from the account, reasoning that the federal entity charged with implementing the

underlying qualified domestic relations order ("QDRO") correctly applied the relevant federal

regulations.  For the reasons that follow, we hold that the trial court possessed the statutory

authority to enter the order so as to effectuate the original intent of the parties.  Accordingly, we

affirm the judgment below.

I.        BACKGROUND

Husband and wife married on January 7, 1983, and they separated on July 1, 2000.  On

December 22, 2000, the parties entered into a separation agreement providing, *inter alia*, that

---

* Pursuant to Code § 17.1-413, this opinion is not designated for publication.  Moreover, as this opinion has no precedential value, we recite only those facts necessary to our holding.

"the marital share of all retirement benefits, deferred compensation, thrift plan, savings plan, 401(K) or equivalents, in Husband's name shall be equally divided by the parties by qualified domestic relations order." Also, according to the separation agreement, husband's attorney was given "the primary responsibility for completion of the qualified domestic relations order."

On August 24, 2001, the trial court issued a final decree awarding husband a divorce *a vinculo matrimonii*. The divorce decree ratified, confirmed, approved, and incorporated the separation agreement, further providing that "[t]his cause [is] retained on the active docket of this Court for entry of appropriate Qualified Domestic Relations Orders."

During the marriage, husband established a Thrift Savings Plan ("TSP") pursuant to his employment with the United States Government.[1] Husband's TSP account is comprised of two investment funds, a Government Securities Investment Fund, or "G Fund," and a Common Stock Index Investment Fund, or "C Fund."[2] Although a G Fund has a guaranteed rate of return, see 5 U.S.C. § 8438(e), the value of a C Fund will fluctuate according to market forces. On July 1, 2000—the date of the parties' separation—the TSP account had a value of $103,320.58. Following the parties' separation, however, the value of the TSP account decreased despite

---

[1] Husband, a "FERS" participant in the TSP program, could contribute a percentage of his basic pay for each pay period to his TSP account. See 5 U.S.C. § 8432(a)(2); 5 C.F.R. § 1600.22(a)(1). A portion of these voluntary contributions would then be "matched" by the United States Forest Service, husband's federal employer. See 5 U.S.C. § 8432(c).

[2] Federal employees who establish a TSP also have the option of investing in a Fixed Income Index Investment Fund, or "F Fund," Small Capitalization Stock Index Investment, or "S Fund," International Stock Index Investment, or "I Fund," and Lifecycle investments, or "L Funds," which are diversified portfolios comprised of a combination of the other five investment options. See 5 U.S.C. § 8438(b). An investment in any TSP fund other than a G Fund does not have a guaranteed return and, thus, is made at the employee's risk. See 5 U.S.C. § 8439(d); 5 C.F.R. § 1601.1(b).

husband's continuing contributions to the account. The decline in value was attributable entirely to investment losses in husband's C Fund.[3]

On May 13, 2004,[4] the trial court entered a QDRO providing that wife "is entitled to 50% of the marital share portion of [husband's] interest in the Thrift Savings Plan as of July 1, 2000." The QDRO indicates that "[t]he marital share portion of [husband's] Thrift Savings Plan account shall be calculated based on [the value of the account] as of July 1, 2000," further providing that wife "shall be entitled to 50% of said marital share, *together with earnings and losses on her share from July 1, 2000 through the distribution of her share to her*." (Emphasis added). The QDRO also provides that the trial court "shall retain jurisdiction with respect to this Order to the extent required to maintain its qualified status and the original intent of the parties stipulated herein," and "shall also retain jurisdiction to ender [sic] such further orders as are necessary to enforce the assignment of benefits to [wife] as set forth herein . . . ."

On September 24, 2004, the date the Federal Thrift Retirement Board implemented the QDRO, the TSP had a value of $97,960.08. Of that amount, the board distributed $63,249.59 to wife. In reaching its decision, the board determined that wife was entitled to half the value of the account as of July 1, 2000, or $51,660.29, plus earnings in the amount of $11,589.30.[5] In

---

[3] Approximately 90% of husband's contributions to his TSP account were allocated to the C Fund.

[4] The record reflects that the almost three-year delay between entrance of the divorce decree and the issuance of the QDRO was primarily attributable to husband, who—by the terms of the separation agreement—was vested with the responsibility for preparing the order.

[5] According to 5 C.F.R. § 1653.4(f), if a qualified retirement benefits court order provides that the payee spouse should receive earnings on the account but fails to specify a return rate, the payee spouse will be credited "with TSP investment earnings . . . with the rate of return for the G Fund." 5 C.F.R. § 1653.4(f)(3). There is no equivalent federal regulation setting forth the procedure to follow when calculating post-valuation *losses* in a TSP account.

calculating the amount of earnings and losses, the board, applying 5 C.F.R. § 1653.4, apparently applied the G Fund growth rate to determine wife's share in the account.[6]

On October 7, 2004, husband filed a motion with the trial court, requesting an order directing wife "to convey directly unto him as an IRA transfer incident to divorce . . . the sum of $15,370.00 to reimburse [husband] for what was an over payment to [wife] out of [husband's] THRIFT account." Husband argued that the board's distribution of funds was "not consistent with the decree of this Court or the agreement of the parties," reasoning that wife was entitled to $47,880, half the value of the TSP as of the date of *distribution* less the amount of husband's post-separation contributions to the TSP account. Because wife received $63,249.59, husband concluded that wife was required to reimburse him for the alleged overpayment.

In response, wife's counsel noted that wife "had zero control" over the TSP account during the time period that it was losing value, concluding that application of the federal regulation was "exactly right because it penalizes the person who makes bad investment choices and chooses to delay" distribution of the TSP funds. Wife further argued that the trial court "doesn't have any authority to undo" the board's distribution of funds from the account.

After conducting a hearing on the merits, the trial court determined that it was "within the inherent power of the Court to do equity" and, therefore, to modify the distribution of funds from the TSP account. The trial court then found that "the value of the marital share portion of [husband's] Thrift account is $103,320.58," the value of the TSP account as of the date of the

---

[6] According to 5 C.F.R. § 1653.3(f), when distributing funds pursuant to a qualifying retirement benefits court order, the board is required to mail a decision letter to all parties providing, *inter alia*, "[a]n explanation of how the payment will be calculated and an estimated amount of payment." 5 C.F.R. § 1653.3(f)(4)(i). Assuming such a decision letter was mailed, it was never made a part of the lower court's record. Accordingly, in describing how the board arrived at its distribution of funds from the TSP account, we rely solely on the parties' representations to the trial court.

parties' separation. The trial court concluded that the separation agreement entitled wife to half that amount, or $51,660.29, and therefore determined that wife had received an overpayment of $11,589.30. The court then entered an order directing wife to transfer that amount to husband "in order to effectuate an equal distribution of the marital share portion of the Thrift account consistent with the Decree of divorce entered herein . . . ." Wife appeals from this final order.

## II.    ANALYSIS

The sole issue presented on appeal is whether the trial court possessed the authority to enter an order modifying the board's distribution of funds from the TSP account.[7] Because the trial court entered the order to effectuate the original intent of the parties as expressed in the separation agreement, we hold that the trial court acted within its statutory authority when it issued the challenged decree. Accordingly, we affirm the judgment below.

Under Rule 1:1, trial courts ordinarily lose jurisdiction over a case twenty-one days after entry of the final decree. See Rule 1:1. According to Code § 20-107.3(K), however, the trial court has "the continuing authority and jurisdiction to make any additional orders necessary to effectuate and enforce any [domestic relations] order," including the authority to "[m]odify any order . . . intended to affect or divide any . . . retirement benefits pursuant to . . . federal law[]," if the modification is intended "to revise or conform its terms so as to effectuate the expressed intent of the [original] order." Code § 20-107.3(K)(4); see also Fahey v. Fahey, 24 Va. App.

---

[7] We note that the issue being decided on appeal is not whether the Federal Thrift Retirement Board properly applied the relevant federal regulations when determining wife's share of the TSP account. Indeed, it is questionable whether we would possess the jurisdiction to do so. See 5 C.F.R. § 1653.3(a) ("The payment of a retirement benefits court order from the TSP is governed solely by [federal law]. The TSP will honor retirement benefits court orders properly issued by a [state] court . . . . However, these courts have no jurisdiction over the TSP and the TSP cannot be made a party to the underlying domestic relations proceedings."); see also 5 C.F.R. § 1653.3(g) ("The TSP decision letter is a final determination of the parties' rights in the account.").

254, 256-57, 481 S.E.2d 496, 497 (1997) (*en banc*).  Also, the QDRO entered in this case provides that the trial court "retain[s] jurisdiction with respect to this Order to the extent required to maintain . . . the original intent of the parties . . . ."  This reservation of jurisdiction, in conjunction with Code § 20-107.3(K), vested the trial court with the authority to issue additional orders if necessary to effectuate the intent of the parties as expressed in the original divorce decree.

A decree entered pursuant to Code § 20-107.3(K) must, however, "be 'consistent with the substantive provisions of the original [divorce] decree' and not 'simply [] adjust its terms in light of the parties' changed circumstances."  Williams v. Williams, 32 Va. App. 72, 75, 526 S.E.2d 301, 303 (2000) (quoting Caudle v. Caudle, 18 Va. App. 795, 798, 447 S.E.2d 247, 249 (1994)); see also Fahey, 24 Va. App. at 256, 481 S.E.2d at 497.  That is, because an unappealed divorce decree becomes final twenty-one days after it is entered, the final decree becomes "the law of [the] case" and is not "subject to later modification."  Hastie v. Hastie, 29 Va. App. 776, 782, 514 S.E.2d 800, 804 (1999).  The question that must be resolved, then, is whether the decree ordering wife to re-convey a portion of the TSP funds was necessary to effectuate the original intent of the parties, or whether the order constituted an impermissible, substantive modification of the final divorce decree.

In this case, the terms of the separation agreement, as incorporated into the final divorce decree,[8] are clear and unambiguous:  "the marital share" of husband's TSP account was to be

_____

[8] "When a trial judge affirms, ratifies, and incorporates a property settlement agreement into a final decree of divorce, that agreement becomes, 'for all purposes . . . a term of the decree, . . . enforceable in the same manner as any provision of such decree.'"  Baker v. Baker, 38 Va. App. 384, 386, 564 S.E.2d 164, 165 (2002) (quoting Campbell v. Campbell, 32 Va. App. 351, 356, 528 S.E.2d 145, 147 (2000)) (alterations in original).

"equally divided by the parties." In accordance with Code § 20-107.3(G)(1),[9] the resulting

QDRO provided that the marital share of the account would be equivalent to the value of the

TSP as of July 1, 2000—the date of the parties' separation. However, the QDRO included

additional language indicating that wife was also entitled to "earnings and losses on her share

from July 1, 2000 through the distribution of her share to her." And, because of the added

language, the board awarded wife funds in excess of half the value of the TSP as of the date of

separation.

Because the QDRO, as implemented by the board, awarded wife more than half of the

marital share of the account, it "did not effectively carry out the mandate of [the divorce]

decree." Williams, 32 Va. App. at 76, 526 S.E.2d at 303. Accordingly, the trial court was

empowered to issue an additional decree "'to effectuate the expressed intent of the [original]

order,'" id. (quoting Code § 20-107.3(K)(4)) (alteration in original), as long as the provisions of

the additional decree did not substantively modify the original divorce decree, see id.; see also

Hastie, 29 Va. App. at 781, 514 S.E.2d at 803 ("[A]ny clarification or modification of the

divorce decree must be 'consistent with the substantive provisions of the original decree.'"

(quoting Caudle, 18 Va. App. at 798, 447 S.E.2d at 249)).

Here, the order did not "modif[y] the percentage or amount due the wife" as set forth in

the divorce decree, but rather, "accomplished what the [divorce decree] directed, but which the

QDRO did not fully accomplish." Williams, 32 Va. App. at 76, 526 S.E.2d at 303. Accordingly,

the decree ordering wife to transfer the overpayment to husband "was not a substantive

---

[9] The "marital share" of retirement benefits earned during the marriage is statutorily defined as "that portion of the total interest, the right to which was earned during the marriage *and before the last separation of the parties . . . .*" Code § 20-107.3(G)(1) (emphasis added).

- 7 -

modification" of the divorce decree and, therefore, was permissible pursuant to Code § 20-107.3(K). See id.

We further note that, contrary to the apparent position of the dissent, it is the intent of the parties as expressed in the original divorce decree—not the intent of the parties as expressed in a subsequent QDRO—that is controlling. A QDRO—even if unobjected to—cannot substantively modify the terms of the original divorce decree. As this Court has noted, once twenty-one days have elapsed from entry of the final divorce decree, a trial court has no "authority to substantively modify its original order equitably distributing . . . [retirement] benefits, *irrespective of any agreement by the parties to the contrary*." Wilson v. Wilson, 25 Va. App. 752, 758, 492 S.E.2d 495, 498 (1997) (emphasis added). A QDRO, then, is a mere "administrative mechanism" through which the court enforces the original divorce decree. Turner v. Turner, 47 Va. App. 76, 80, 622 S.E.2d 263, 265 (2005). Thus, even if the parties fail to object to entry of a QDRO that substantively modifies the terms of the original divorce decree, the QDRO cannot, as the dissent asserts, become a new "contract" between the parties. See Wilson, 25 Va. App. at 758, 492 S.E.2d at 498.

Here, because the QDRO awarded post-separation earnings and losses—which were neither mentioned nor awarded in the separation agreement—the QDRO substantively modified the provisions of the original divorce decree. In Baker v. Baker, 38 Va. App. 384, 564 S.E.2d 164 (2002), for example, the parties executed a separation agreement providing that wife was entitled to "one-half" of husband's profit-sharing plan, valued as of the date of the agreement. The trial court incorporated this separation agreement into the final decree of divorce. A year later, the trial court entered a QDRO awarding wife the specified one-half plus "gains and losses." On appeal, we reversed, holding that "the final decree of divorce, which affirmed, ratified, and incorporated the property settlement agreement, is unambiguous in providing an

- 8 -

allotment to the wife of one-half of the profit sharing plan 'valued as of the date of [the] agreement.'" Id. at 388, 564 S.E.2d at 166. Noting that "[t]he [separation] agreement did not additionally provide for an allocation of gains and losses to that amount," we reversed and remanded "for entry of a QDRO consistent with the final decree." Id.

Similarly, in the original divorce decree, husband and wife agreed to split the "marital share" of the TSP account. As the dissent recognizes, the marital share of a pension account is determined based on the value of the account as of the date of the parties' separation. See Code § 20-107.3(G)(1). To the extent that the QDRO sought to award post-separation earnings and losses, the QDRO "modified the total amount to be paid" and, therefore, substantively modified the provisions of the original divorce decree. Hastie, 29 Va. App. at 782, 514 S.E.2d at 803; see Baker, 38 Va. App. at 388, 564 S.E.2d at 166. Thus, regardless of whether the parties consented to entry of the QDRO, the trial court had no jurisdiction to order an award of post-separation earnings and losses. See Wilson, 25 Va. App. at 758, 492 S.E.2d at 498 ("The jurisdiction of the [trial] court cannot be established by consent."). As a result, those provisions in the QDRO were null and void. See Baker, 38 Va. App. at 388, 564 S.E.2d at 166.

Accordingly, by entering an order effectuating the intent of the parties as expressed in the original divorce decree, as opposed to the intent of the parties as expressed in the QDRO, the trial court, in effect, corrected its earlier, erroneous ruling. Thus, to hold according to the theory advanced by the dissent, we would have to find that the trial court lacks the statutory authority to correct an erroneous distribution of assets resulting from an order that the trial court lacked the jurisdiction to enter in the first place. This, we decline to do.

### III.    CONCLUSION

For these reasons, we hold that the trial court had the statutory authority to order wife to convey the $11,589.30 overpayment to husband.  Accordingly, we affirm the judgment below.

<u>Affirmed.</u>

McClanahan, J., dissenting.

I agree with the majority that Code § 20-107.3(K)(4), and paragraph E of the QDRO, vested the trial court with authority to retain jurisdiction to effectuate the intent of the parties' separation agreement, which was incorporated into the divorce decree. However, the court does not have authority to abandon the separation agreement, the decree, and the QDRO and rewrite them. The trial court's decision and the majority ignore the specific term of the parties' separation agreement, which indicated that the QDRO would divide the marital share of the retirement benefits. Husband authored the QDRO, which he signed and asked the court to enter, and the QDRO clearly and unambiguously stated the original intent of the parties. Husband is the author of his own misfortune here, and the court does not have the authority to rewrite the parties' agreement to correct a perceived injustice that was entirely of husband's own making. Therefore, I respectfully dissent.

The separation agreement stated, "The marital share[10] of all retirement benefits . . . in Husband's name shall be *equally divided by the parties by qualified domestic relations order*." (Footnote and emphasis added.) The separation agreement was silent on earnings and losses. Almost a year later, the trial court incorporated the parties' separation agreement into its final decree of divorce, and ordered husband to prepare the QDRO. After repeated requests by wife, the QDRO was prepared by husband's counsel and entered by the court without objection almost three years after the decree and almost four years after the separation agreement was executed. The QDRO provided, "The Court shall retain jurisdiction with respect to this Order to the extent required to maintain its qualified status and the *original intent of the parties stipulated herein*." (Emphasis added.)

---

[10] Code § 20-107.3(G), which the QDRO cited, provides that the "marital share" is the "portion of the total interest, the right to which was earned during the marriage and before the last separation of the parties . . . ."

- 11 -

Citing the applicable federal laws, the QDRO also stated, "Julie K. Overcash shall be entitled to 50% of said marital share, together with earnings and losses on her share from July 1, 2000, through the distribution of her share to her." (emphasis in original document). The QDRO term on earnings and losses did not alter any critical, substantive provision of the separation agreement and final decree. It merely clarified an otherwise silent term of the separation agreement and final decree. Moreover, the parties agreed the underlined and emphasized clarification was "a stipulation" of their "original intent."[11] Thus, wife did not receive an "overpayment"; instead, the distribution complied with the terms of the parties' separation agreement, the final decree, and the QDRO language.[12]

At the close of the hearing, the trial court stated, "As we hear all the time, I think it is within the inherent power of the Court to do equity . . . . I intend to enforce the language of the

---

[11] "No rule for the construction of written instruments is better settled than that which attaches great weight to the construction of the instrument by the parties themselves." First Nat'l Exchange Bank v. Roanoke Oil. Co., 169 Va. 99, 115, 192 S.E. 764, 771 (1937) (internal quotation marks and citations omitted). If the meaning of an instrument be doubtful, evidence of the acts of the parties under it may be received to show intent. See Glenn v. Augusta Perpetual Bldg. & Loan Co., 99 Va. 695, 701, 40 S.E. 25, 27 (1901); Knick v. Knick, 75 Va. 12, 19-20 (1880); Bank of the Old Dominion v. McVeigh, 73 Va. (32 Gratt.) 530, 541-42 (1879). "If a written contract is capable of more than one construction, then the courts will give to it that construction which the parties have placed upon it." Robin v. Sydeman Bros., Inc., 158 Va. 289, 300, 163 S.E. 103, 106 (1932). "The dealings of the parties to a contract in relation to its terms are often conclusive upon questions arising as to its effect or meaning." Id. at 299, 163 S.E. at 106 (internal quotation marks and citation omitted). "In the construction of contracts in which obscurity exists, great weight is given by the courts to the acts of the parties done under the contracts, as an indication of their intention." Moore v. The Chesapeake & Ohio Ry. Co., 159 Va. 703, 730, 167 S.E. 351, 360 (1933).

[12] The trial court's subsequent order requiring wife to reimburse husband was not, therefore, ministerial, but constituted an impermissible and substantive modification of the intent of the parties, as expressed in their separation agreement, as incorporated in the final decree and as set forth in the endorsed QDRO without objection. Cf. Newsome v. Newsome, 18 Va. App. 22, 26, 441 S.E.2d 346, 348 (1994) (where the trial court's amendments "involved purely ministerial acts related to the QDRO, rather than alteration of its substantive provisions"); see also Williams v. Williams, 32 Va. App. 72, 526 S.E.2d 301 (2000); Caudle v. Caudle, 18 Va. App. 795, 447 S.E.2d 247 (1994).

- 12 -

agreement and the language of the decree." In fact, however, the trial court's decision ordering wife to transfer the earnings and losses portion of the distribution ignores both the parties' separation agreement incorporated into the final decree and the QDRO, which was entered into without objection.[13] The court's order stated that it was making the decision "in order to effectuate an equal distribution of the marital share portion of the Thrift account consistent with the Decree of divorce entered herein and in order to do equity . . . ." However, in substituting its

---

[13] The majority cites Hastie, Baker, and Wilson as support for the notion that parties may not clarify the original intent of the decree in a subsequent QDRO. However, not one of those cases included facts where the parties agreed to a QDRO in which their original intent was stated, as is the case here. See Hastie v. Hastie, 29 Va. App. 776, 514 S.E.2d 800 (1999); Baker v. Baker, 38 Va. App. 384, 564 S.E.2d 164 (2002); Wilson v. Wilson, 25 Va. App. 752, 492 S.E.2d 495 (1997).

Specifically, those cases differ in at least three important aspects: (1) In all three cases, Hastie, Baker, and Wilson, the divorce decree provided a specific payment amount or formula to calculate the payment amount. In this case, the divorce decree did not specify a specific amount, but said, "The marital share of all retirement benefits . . . in Husband's name shall be equally divided by the parties by qualified domestic relations order." Thus, the decree did not provide any specific payment term, but left the "equal" division to the QDRO; (2) in Hastie and Baker, the terms of the QDRO were in dispute; in Wilson, a revised QDRO was signed by both parties, but later contested by husband who said the QDRO was signed in error. In this case, the QDRO was prepared by husband, who asked the court to enter it, and was agreed to by wife. In Hastie and Wilson, no QDRO was entered. Here, the trial court entered the QDRO, and neither party objected to its entry; and, (3) the QDROs in Hastie, Baker, and Wilson were not consistent with the specific terms of the decrees in those cases. In contrast, in this case, the language of the QDRO was consistent with the decree, which left the terms of the division to the QDRO, and the QDRO clearly stated that it constituted the "original intent" of the parties' agreement as incorporated into the decree.

own contract in place of the parties' contract, which it cloaks as an attempt to "do equity," the

court, in fact, discounts wife's equity and awards it to husband.[14]

For these reasons, I dissent.

---

[14] "'A court is not at liberty to rewrite a contract simply because the contract may appear to reach an unfair result.'" Rogers v. Yourshaw, 18 Va. App. 816, 823, 448 S.E.2d 884, 888 (1994) (quoting Kaufman v. Kaufman, 7 Va. App. 488, 501, 375 S.E.2d 374, 381 (1988)); see also Verling v. Quarles, 217 Va. 188, 191, 227 S.E.2d 684, 686 (1976) ("[T]he trial court made a material departure from the terms of the contract and, in effect, made an agreement for the parties and then sought to compel them to execute it. While the agreement it made may be a more equitable one, it is not the agreement either party claims was made. A careful consideration of the evidence and exhibits fails to convince us that this is a proper case in which the powers of a court of equity should be invoked . . . ."); Derby v. Derby, 8 Va. App. 19, 30, 378 S.E.2d 74, 80 (1989) ("Courts cannot relieve one of the consequences of a contract merely because it was unwise." (internal quotation marks and citation omitted)).